IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JERAMEY ORTEGA, | Case No. 6:15-cv-01598-SB |
| Plaintiff, | **FINDINGS AND RECOMMENDATION** |
| v. | |
| DENYSE GOLDADE, | |
| Defendant. | |

**BECKERMAN, Magistrate Judge.**

Jeramey Ortega ("Plaintiff") brings this 42 U.S.C. § 1983 action against Denyse Goldade ("Defendant"), a hearings officer for the Oregon Department of Corrections ("ODOC"). Plaintiff alleges that Defendant acted with deliberate indifference to a known danger in violation of Plaintiff's rights under the Eighth and Fourteenth Amendments. Plaintiff also alleges a state law negligence claim. Defendant now moves for summary judgment on both claims. *See* FED. R. CIV. P. 56. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. For the reasons that follow, the district judge should deny Defendant's motion for summary judgment (ECF No. 36).

PAGE 1 – FINDINGS AND RECOMMENDATION

## BACKGROUND

Plaintiff has been in ODOC custody since June 23, 2013. (Norton Decl. Ex. 2.) Plaintiff was first housed at Coffee Creek Intake Center ("CCIC") and transferred from CCIC to the Oregon State Penitentiary ("OSP") on July 23, 2013. (*Id*. at 1.) While housed at OSP in October 2013, Plaintiff was approached by two other inmates who told Plaintiff he was a "marked man" and a "snitch" because of testimony he had given on behalf of the state in a murder trial. (Ortega Decl. ¶ 2.) On October 22, 2013, Plaintiff transferred to the Oregon State Correctional Institution ("OSCI"). (Norton Decl. Ex. 2, at 1; *see also* Norton Decl. Ex. 4, at 5.)

On or about October 28, 2013, while Plaintiff was housed at OSCI, he met a fellow inmate named Randall Keen ("Keen"). (Ortega Dep. 116:9-16.) The meeting was brief between Plaintiff and Keen, and their interaction with each other amounted to an exchange of names and "regular talk." (Ortega Dep. 118:5-10.)

On the morning of October 30, 2013, Plaintiff was working in the OSCI dining room serving food. (Goldade Decl. Ex. 1, at 1.) Approximately fifty other inmates were present. (*Id.*) Keen was standing in a serving line and then proceeded toward Plaintiff and tapped him on the right shoulder. (*Id.*) When Plaintiff turned his head to the right, Keen punched Plaintiff in the face. (*Id.*) Plaintiff fought back before OSCI staff arrived on the scene and ordered the inmates to stop fighting. (*Id.*) After Keen and Plaintiff refused to comply with the orders to stop, both were escorted to disciplinary segregation pending an investigation. (*Id.*) Plaintiff sustained minor injuries that did not require medical treatment. (Goldade Decl. Ex. 1, at 11.)

Later that day, Plaintiff submitted an Inmate Communication Form, also called a "kyte," to Captain Tammy Norton, a Correctional Captain. (Norton Decl. Ex. 3.) Plaintiff wrote on the form, "I have been trying to get to Two Rivers [Correctional Institution ("TRCI")] cause everywhere I go I keep getting taken out. I testified in June, and the word followed me to prison.

PAGE 2 – FINDINGS AND RECOMMENDATION

I would like to be put into protective custody. I was just transferred from OSP for the same reason. Unless I go to Two Rivers, I will keep being assaulted." (*Id.*)

On November 6, 2013, Defendant presided over a disciplinary hearing to determine whether Plaintiff had violated ODOC rules against fighting. (*Id.*; *see also* Goldade Decl. ¶¶ 5-6.) Defendant worked as a hearings officer for ODOC for twenty-five years and has presided over approximately 20,000 to 25,000 hearings. (Goldade Decl. ¶ 4.) Defendant asked Plaintiff during the hearing if he knew why Keen had assaulted him, whether Plaintiff knew Keen prior to the assault, and whether Plaintiff felt unsafe. (Ortega Dep. 27:7-18.) Plaintiff told Defendant that he did not know Keen, he did not know why Keen assaulted him, and he did not feel unsafe. (*Id.*)

After Plaintiff's hearing concluded and the audio recorder was turned off, Defendant asked Plaintiff if he had anything else to say. (Ortega Dep. 26:1-6.) Plaintiff then "ran [Defendant] down the whole scenario" and made numerous statements off the record about the conflicts he endured during his stay at OSCI. (Ortega Dep. 27:22-24.) Plaintiff told Defendant that he was a "marked man" and that other prisoners in the facility knew about the testimony he had previously provided on behalf of the state. (Ortega Decl. ¶¶ 7-9.) Specifically, Plaintiff told Defendant, "I was marked, a marked man. I was considered a rat. And if I go back into OOCI [sic] on the mainline that I'll just continually be attacked. Or if that they send me to any other prison, other than to the prison I'm at right now, that I'll just continually be assaulted, I need to not go back to mainline[.]" (Ortega Dep. 25:10-15.) Plaintiff told Defendant, "I just try to be as much under the radar as much as possible, with what it's spreading even more, that I'm a rat." (Ortega Dep. 28:10-15.) Plaintiff asked Defendant not to put him back on mainline at OSCI and to transport him to TRCI, but Plaintiff did not specifically request that Defendant separate Plaintiff and Keen. (Ortega Dep. 29:14-18.)

Defendant states that throughout her twenty-five years of experience, it was not uncommon for inmates to wait until after hearings were over to make additional statements "off the record." (Goldade Decl. ¶ 8.) Plaintiff explained at his deposition that he "[does not want] to be on any kind of paper," and that he had waited for Defendant to stop the recording so that it would "not fall on" Plaintiff. (*Id.*) Plaintiff stated in his declaration that he requested the recording be turned off so that he could report his fears to Defendant without causing a paper trail that could be discovered by other inmates. (Ortega Decl. ¶ 6.)

After the hearing, based on video evidence and Plaintiff's testimony, Defendant found that Plaintiff had committed violations under Rule 2.06.03 (Inmate Assault II), and Rule 4.01 (Disobedience of an Order I), and ordered that he be segregated for twenty days until November 18, 2013. (Goldade Decl. Ex. 1, at 1.)

Defendant does not have any specific recollection of the November 6, 2013 hearing or what steps she took after Plaintiff requested transport to TRCI. (Goldade Decl. ¶ 7.) Defendant's typical protocol under these circumstances was to advise the inmate to speak with the facility's correctional captain who had authority to act on the inmate's concerns regarding appropriate and safe housing, and then to report the inmate's concerns to the appropriate correctional captain herself. (Goldade Decl. ¶¶ 9-12.) Two hours after the hearing, Captain Melissa Nofziger, the officer-in-charge of OSCI who had authority to send Plaintiff to another institution, sent an email to Captain Norton stating that Plaintiff had told Defendant he did not feel safe at OSCI and wanted to be moved. (Nofziger Decl. Ex. 9.) Captain Nofziger also copied other OSCI officers on the email who could ensure Plaintiff would not be released from segregation into general population until his concerns had been investigated. (Nofziger Decl. ¶ 7.)

On November 18, 2013, when Plaintiff's disciplinary segregation sanction ended, Plaintiff requested a voluntary administrative segregation housing placement. (Norton Decl. ¶¶ 10-11; Ortega Dep. 87:12-17.) Captain Norton granted this request and recorded that the reason for Plaintiff's placement in administrative segregation was because Plaintiff was at risk from an "on site hit on him from the Native population," which Norton recognized to mean Plaintiff faced a threat of violence. (Norton Decl. Ex. 4, at 5.) Plaintiff was to remain in administrative segregation for thirty days. (*Id.*)

Keen resided in disciplinary segregation at OSCI from October 30, 2013 to November 14, 2013. (Pedro Decl. ¶¶ 3-4.) TRCI has a larger number of disciplinary housing units than OSP or OSCI, and therefore on November 10, 2013, Keen transferred to OSP and on November 14, 2013, to TRCI, to serve his remaining time in disciplinary segregation. (*Id.;* Pedro Decl. Ex. 10.)

On December 19, 2013, Plaintiff also transferred to TRCI. (Norton Decl. Ex. 2, at 1.) Four months later, in April 2014, a series of altercations between approximately twenty-four Hispanic and Native American inmates occurred in Unit 7 at TRCI. (Pedro. Decl. Ex. 12, at 3.) In response to the incidents, Lieutenant Daren Dufloth sent an email to correctional officers on April 18, 2014, stating, "These offenders need to be re-located . . . . There has been no information to suggest they could not walk anyone's [general population] with regards to this incident." (Perriguey Decl. Ex. 5; *see also* Pedro Decl. Ex. 13, at 1.) Plaintiff was included in this email as an inmate who needed to be transferred from TRCI because he was considered to be at risk. (*Id.*) During these incidents, Keen remained housed in segregation at TRCI. (Pedro Decl. Ex. 11.)

On April 29, 2014, when Keen's disciplinary period had ended and Plaintiff was to be transported as a result of the April incident, both Keen and Plaintiff were loaded onto the same

transport vehicle at TRCI to be taken to OSP. (Pedro Decl. ¶¶ 5, 15-16.) Six months had passed since the original altercation between Keen and Plaintiff at OSCI. (*See* Norton Decl. ¶ 6; Pedro Decl. ¶ 6.) When the inmates arrived at OSP and were off-loading, transport staff began removing restraints. (Pedro Decl. Ex. 15, at 2.) After Keen's restraints were removed and he sat down, Keen stood up and walked toward Plaintiff, who was kneeling on a bench facing a wall while getting his leg restraints removed. (*Id.*) Keen punched Plaintiff on the side of his face from behind. (*Id.*) Officers restrained Keen and removed him from the area. (Pedro Decl. Ex. 15, at 2.) Plaintiff had bruising on his right eye and cheek area, and was treated on-site before being transported to the disciplinary segregation unit. (Pedro Decl. Ex. 15, at 2.)

Plaintiff returned to TRCI on May 8, 2014. (Norton Decl. Ex. 2, at 2.) Plaintiff filed a grievance report on May 12, 2014, regarding the second attack by Keen, stating that Plaintiff had told the officers he could not be around Keen because of a previous assault. (Pedro Decl. Ex. 16, at 1.) Captain Pedro submitted a response to Plaintiff's grievance report, stating, "I do see that you and Inmate Keen were involved in an altercation at OSCI on 10/30/2013. You both were held accountable for this incident. Inmate Keen is not listed as a conflict for you and I cannot find any requests to make him one from you. If you wish for him to be listed as a conflict, please fill out a conflict form[.]" (Pedro Decl. Ex. 16, at 2; Perriguey Decl. Ex. 8.) Plaintiff did not submit an Inmate Conflict Report Form, which is also called a CD 1473. (Ortega Dep. 114:1-6.)

Plaintiff appealed the grievance denial on June 26, 2014. (Pedro Decl. Ex. 17, at 1.) On July 28, 2014, Superintendent J. Taylor [full name unknown] responded to Plaintiff's appeal, stating he concurred with the original denial because nothing in Plaintiff's file indicated Plaintiff had a conflict with Keen, and because Officer Pedro had instructed Plaintiff on the proper procedure to document conflicts. (*Id.* at 3.) Superintendent Taylor also wrote, "If you still believe

a conflict is warranted you will need to contact Capt. Jackson and request a conflict form, as it appears you have not followed Capt. Pedro's directive." (*Id.*)

ODOC's conflict management policy is governed by ODOC Policy 40.1.12. The policy was put in place for the purpose of "maintain[ing] an information system that monitors and controls the identification and separation of conflicts for those inmates who pose a serious threat to other inmates or employees/contractors within Department of Corrections facilities." (Norton Decl. Ex. 6, at 1.) ODOC personnel use the system to make decisions regarding inmate housing, transportation, placement, and programming. (Norton Decl. ¶ 18.) If an inmate or staff member perceives a conflict, the policy instructs that he or she shall report those conflicts via an Inmate Conflict Report form. (Norton Decl. Ex. 6, at 4.) Only designees of functional unit managers may approve and enter the conflict into the tracking system. (*Id.* at 1.)

During intake, inmates are provided with the Intake Inmate Handbook to inform them about the conflicts reporting process and their responsibility to report conflicts by using the Inmate Conflict Form or reporting to a staff member. (*Id.* at 3.) In order to prevent inmates from abusing the conflict reporting process by submitting unsubstantiated conflicts, self-reported conflicts will not be entered into the system without proper verification and documentation. (Norton Decl. Ex. 6, at 4-5.) Not every dispute constitutes a "conflict" under ODOC's policy. (Norton Decl. ¶ 21.) Inmate conflict that is short-lived or that does not create a risk that the policy is intended to prevent will not be reported as a formal conflict. (*Id.*) It is not uncommon for inmates to choose not to report conflicts between other inmates. (Norton Decl. ¶ 5.) Inmates may be uncooperative in disclosing internal dynamics of the conflict to ODOC staff. (*Id.*)

ODOC staff members are required to follow conflict management policy. The policy instructs, "If a DOC/ECE employee or contractor becomes aware of a potential inmate-to-inmate

PAGE 7 – FINDINGS AND RECOMMENDATION

conflict, he/she *shall* promptly communicate the conflict in writing to the Institution Security Manager using," among other things, "the DOC Inmate Conflict Report form (CD 1473)." ([Perriguey Decl. Ex. 1, at 4](#)) (emphasis added). Such conflicts include a documented serious threat to personal safety, documented history of assault with a weapon, documented history of a serious injury requiring medical attention, documented serious incident in a county jail, a victim of a verifiable crime that occurred in the community, or a documented security threat/racial tension. (*[Id](#)*. at 2.)

Plaintiff's records in the conflict management system indicate conflicts between Plaintiff and two inmates not related to this matter. ([Norton Decl. Ex. 8.](#)) The conflict management system does not indicate any conflict between Plaintiff and Keen. Plaintiff stated that "there was no need to" fill out a conflict form regarding the conflict with Keen when he was advised to do so because Keen was released on parole. ([Ortega Dep. 114:1-6.](#))

## ANALYSIS

### I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. [FED. R. CIV. P. 56(a).](#) On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in favor of that party. *[Porter v. Cal. Dep't of Corr.](#)*, [419 F.3d 885, 891 (9th Cir. 2005)](#) (citations omitted). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *[Anderson v. Liberty Lobby, Inc.](#)*, [477 U.S. 242, 249 (1986).](#) "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *[Matsushita Elec. Indus. Co. v. Zenith Radio Corp.](#)*, [475 U.S. 574, 587 (1986)](#) (citation omitted).

PAGE 8 – FINDINGS AND RECOMMENDATION

## II. DISCUSSION

Defendant moves for summary judgment on three grounds: (1) Plaintiff cannot establish an Eighth Amendment failure to protect claim because there is no genuine issue of material fact in dispute as to whether Defendant was deliberately indifferent to Plaintiff's safety; (2) Defendant is qualifiedly immune from suit; and (3) sovereign immunity bars Plaintiff's state law negligence claim. As explained below, the Court concludes that Plaintiff has established that there is a genuine issue of material fact in dispute as to whether Defendant was aware that Plaintiff faced a substantial risk of harm and whether her response to the risk of harm was reasonable, and that Plaintiff's negligence claim is barred by sovereign immunity.

### A. Failure to Protect Claim

"Prison officials have a duty under the Eighth Amendment prohibition of cruel and unusual punishments to protect prisoners from violence at the hands of other prisoners because being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009) (citation, quotation marks, and brackets omitted). Not every injury suffered by a prisoner at the hands of another rises to a constitutional violation by a prison official. *Id.* (citation omitted). Prison officials will only be liable under the Eighth Amendment if they demonstrate "deliberate indifference" to "conditions posing a substantial risk of harm" to an inmate. *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

"To be deliberately indifferent, the prison 'official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.'" *Byerly v. Deputy Warden*, 246 F. App'x 512, 514 (2007) (citing *Farmer*, 511 U.S. at 837). "[T]he officials need not have intended any harm to befall the inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of

PAGE 9 – FINDINGS AND RECOMMENDATION

serious harm." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013) (citation and quotation marks omitted). An Eighth Amendment violation may result from "a prison official's act or omission," *Clem*, 566 F.3d at 1181 (quoting *Farmer*, 511 U.S. at 834), but even if an ultimate harm was not averted, if a prison official knew of a substantial risk and responded reasonably to that risk, then the prison official may be free from liability. *Farmer*, 511 U.S. at 844.

The standard for deliberate indifference is high, and mere negligence by a prison official is insufficient for an Eighth Amendment violation claim. *Farmer*, 511 U.S. at 835. A "prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *See Farmer*, 511 U.S. at 847.

Plaintiff has demonstrated a genuine issue of material fact as to whether Defendant was aware of facts from which an inference could be drawn that Plaintiff faced a substantial risk of harm and as to whether Defendant drew the inference, and whether Defendant's response to the risk of harm was reasonable. Specifically, Plaintiff argues that Defendant was deliberately indifferent to his safety by failing to complete the Inmate Conflict Report Form, CD 1473. ODOC policy requires that ODOC employees "shall" submit documentation of "all" inmate-to-inmate conflicts (including but not limited to serious threats to an inmate's personal safety), so that those inmates can be separated, even when transferred between institutions. (Norton Decl. Ex. 6, at 2, 4; Norton Decl. ¶ 23.) At the November 6, 2013, disciplinary hearing, Defendant became aware that Keen had attacked Plaintiff and that Plaintiff was a target because of his prior cooperation. (Nofziger Decl. ¶ 4; Ortega Dep. 25:10-11.) Thus, Defendant was clearly aware of Keen's first attack, and in light of Plaintiff's off-the-record statements and the nature of the

conflict, she was also aware that the threat had not dissipated. Although Defendant took reasonable steps to address the harm posed to Plaintiff at OSCI, she did nothing to address the risk of harm caused by Keen.

The Ninth Circuit recently reversed the district court's grant of summary judgment in a case alleging failure to protect, to allow a jury to decide if the defendant's response to an inmate attack was reasonable:

> Viewed in the light most favorable to Plaintiff, there is sufficient evidence that [Defendant] was subjectively aware of the risk involved in the escort and acted with deliberate indifference to [plaintiff inmate's] safety. [Defendant] insists that he knew nothing about several of the dangerous aspects of the escort, but there is sufficient evidence for a jury to disbelieve him . . . . In sum, there are triable issues of material fact related to [Defendant]'s awareness of an objectively substantial risk of serious harm.

*Cortez v. Skol*, 776 F.3d 1046, 1052 (9th Cir. 2015); *see also Galliger v. Franke*, No. 2:12-cv-01891-PK, 2015 WL 10373492, at *3-5 (D. Or. Dec. 28, 2015) (denying the defendants' motion for summary judgment in case alleging failure to separate an inmate, where the plaintiff "has generated a genuine issue of material fact as to whether Defendants were deliberately indifferent to the substantial risk of serious harm posed by" failing to separate the plaintiff from an inmate who had previously attacked him), *adopting report and recommendation*, 2016 WL 756473 (Feb. 24, 2016); *Chandler v. Williams*, No. 3:08-CV-00962-ST, 2013 WL 2489139, at *1 (D. Or. June 7, 2013) (denying summary judgment in failure to protect case where the plaintiff presented triable issues of fact as to the reasonableness of the ODOC defendants' responses to the plaintiff's safety requests); *Heilman v. Coursey*, No. 3:11-CV-00594-KI , 2013 WL 486659, at *3 (D. Or. Feb. 6, 2013) (finding that Plaintiff raised a triable issue of fact as to whether ODOC officers "consciously disregarded a substantial risk of harm to [P]laintiff"); *Padgett v. Kowanda*, No. 08-87-HU, 2010 WL 4641662, at *5 (D. Or. Nov. 8, 2010) ("The Magistrate Judge correctly

concluded that summary judgment regarding [Defendant's] possible unreasonableness is unwarranted.").

Plaintiff has demonstrated the existence of disputed facts concerning whether Defendant was aware of a substantial risk of harm to Plaintiff's safety, and whether Defendant's response was reasonable. Therefore, the district judge should deny Defendant's motion for summary judgment.

### B. Qualified Immunity

"The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dunn v. Castro*, 621 F.3d 1196, 1198-99 (9th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A qualified immunity analysis consists of a two-step procedure. *Id.* at 1199. First, the court must determine "whether the facts alleged, construed in the light most favorable to the injured party, establish the violation of a constitutional right." *Id.* (citing *Saucier v. Katz*, 533 U.S. 94, 201 (2001)). Next, the court must determine "whether the right is clearly established such that a reasonable government official would have known that 'his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier*, 533 U.S. at 202). "The plaintiff in a § 1983 action bears the burden of proving that the right allegedly violated was clearly established at the time of the official's allegedly impermissible conduct." *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993) (citations omitted). Furthermore, the court "should be permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Based on the Court's conclusion that a reasonable juror could conclude Defendant violated Plaintiff's Eighth Amendment rights, the first step of the qualified immunity analysis is satisfied. The next step requires the court to determine if Plaintiff's constitutional rights were so clearly established that a reasonable government official would have known her conduct was unlawful. *Saucier*, 533 U.S. at 202. "As early as June 1994, it was clearly established that 'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners,' and that a prison official violates an inmate's Eighth Amendment rights when the prison official exhibits deliberate indifference to the inmate's safety." *Leach v. Drew*, 385 F. App'x 699, 700 (9th Cir. 2010) (citing *Farmer*, 511 U.S. at 833-34). Case law clearly establishes that a prison official's failure to separate an inmate from another inmate who presents a risk of harm constitutes a violation of the inmate's Eighth Amendment rights. *Id.* Accordingly, Defendant is not entitled to qualified immunity here. *See Leach*, 385 F. App'x at 701 (affirming district court's denial of the defendants' motion for summary judgment based on qualified immunity where the defendants "received credible information about a serious and immediate threat to [the plaintiff's] safety but took no meaningful steps to address it" and a "reasonable officer would have understood that delaying a response to the threat would constitute deliberate indifference"); *Heilman*, 2013 WL 486659, at *3 (D. Or. Feb. 6, 2013) ("Defendants are not entitled to qualified immunity" for failing to protect inmate).

    **C.    State Law Negligence Claim**

Both parties agree that pursuant to the Oregon Tort Claims Act (Or. Rev. Stat. 30.265(1)), Defendant is not properly named in Plaintiff's negligence claim, and the Court should substitute the State of Oregon as the appropriate defendant. (*See* Def.'s Mot. Summ. J. at 17-19; Pl.'s Resp. to Def.'s Mot. Summ. J. at 18.) Both parties also agree that the Court should dismiss the negligence claim against the State of Oregon as barred by sovereign immunity. *See*

PAGE 13 – FINDINGS AND RECOMMENDATION

*Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 44 ("The Eleventh Amendment presupposes that each State is a sovereign entity in our federal system and that it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without a State's consent" (citation, quotation marks, and brackets omitted)).

In light of the parties' request, the Court recommends that the district judge substitute the State of Oregon for Defendant in Plaintiff's negligence claim, dismiss the negligence claim because sovereign immunity deprives this Court of jurisdiction to adjudicate the claim (without prejudice to refiling the claim in state court), and deny as moot Defendant's motion for summary judgment on the negligence claim. *See Webber v. First Student, Inc.*, 928 F. Supp. 2d 1244, 1269 (D. Or. 2013) ("Because state sovereign immunity deprives this court of jurisdiction to adjudicate [the plaintiff's tort] claims . . . , [the plaintiff's] second claim for relief should be dismissed and the motions for summary judgment should be denied as moot. Dismissal is without prejudice to [the plaintiff's] right to pursue this claim in state court."); *cf. Moore v. Chambers*, No. 3:11-cv-3012-AC, 2012 WL 5182806, at *4-5 (D. Or. Oct. 1, 2012) (substituting State of Oregon as proper defendant and entering summary judgment on tort claims because the "State is absolutely immune from liability on these tort claims").

## CONCLUSION

For the reasons stated, the district judge should deny Defendant's motion for summary judgment on Plaintiff's Eighth Amendment claim, substitute the State of Oregon as the proper defendant in Plaintiff's negligence claim, dismiss Plaintiff's negligence claim, and deny as moot Defendant's motion for summary judgment on Plaintiff's negligence claim (ECF No. 36).

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections

are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 31st day of August, 2017.

STACIE F. BECKERMAN
United States Magistrate Judge